UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MELVIN TROTTER,

      Petitioner,

vs.

SECRETARY, DEPARTMENT OF
CORRECTIONS

      Respondent.

_____ /

DEATH PENALTY CASE
CASE NO.: 8:06-cv-1872-T-17MSS

## ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

This cause comes before this Court on Petitioner Melvin Trotter's amended 28
U.S.C. §2254 petition for a writ of habeas corpus ("petition"). and memorandum in
support of the petition (Dkt. No. 10 and 16. respectively). to which Respondent filed a
Response. (Dkt. No. 20).  Trotter. a Florida prisoner under penalty of death, challenges
his conviction and sentencing in case no. 86-1225F, entered by the Circuit Court for the
Twelfth Judicial Circuit, Manatee County, Florida.  A review of the petition, the
response, and the record, demonstrates that Trotter's petition for a writ of habeas corpus
must be **DENIED**.

## BACKGROUND

On June 16, 1986, Melvin Trotter entered Virgie Langford's grocery store in Palmetto, Florida, where he obtained a sixteen inch long butcher knife. (Ex. A7, p. 1230-1235, 1240). Trotter took seventy year old Virgie Langford around the neck in a strangle hold, and stabbed her seven times. (Ex. A7, p. 1230-1235, 1240). The stab wounds cut into her pancreas, liver, and stomach. One wound was eight inches deep. (Ex. A7, p. 1230-1235, 1240). One cut was severe enough to disembowel her. (Ex. A7, p. 1230-1235, 1240). Virgie Langford was conscious after the attack, and held her intestines while being taken to the hospital, where she eventually died of heart failure. (Ex. B18, p. 2190). Trotter took her money and food stamps, left her for dead, and then bought and smoked crack. (Ex. A7, p. 1230-1235, 1240).

### *The Initial Trial, Penalty Phase, and the First Direct Appeal*

The state trial court jury found Trotter guilty of robbery with a deadly weapon, and of first degree murder. *Trotter*, 576 So.2d 691 (Fla. 1991). The jury recommended that Trotter be sentenced to death, by a vote of nine to three. *Id.* The sentencing judge found four aggravating circumstances, and four mitigating circumstances. One of the aggravating circumstances was that the crimes were committed while Trotter was on community control pursuant to subsection 921.141(5)(a). Florida Statutes (1985).[1] *Id.*

---

[1] Subsection 921.141(5)(a), Florida Statutes (1985), provided, in relevant part, for aggravating circumstances when a "capital felony was committed by a person under a sentence of imprisonment." (emphasis added). Trotter was on "community control" at the time he committed the murder. The Florida Supreme Court cited Subsection 948.10(1), Florida Statutes, (1985), which provided that community control was "an alternative, community-based method to punish an offender in lieu of incarceration." The Florida Supreme Court said that a violation of probation is not an aggravating circumstance, since probation is not equivalent to being under sentence of incarceration, and cited cases supporting that position. *Trotter*, 576 So.2d at 693. After associating community control with probation, and noting that penal statutes must be strictly construed in favor of the one against whom a penalty is to be imposed, the FL Supreme Court held that being under community control was not to be considered the same as being

The sentencing judge found that the aggravating circumstances outweighed the mitigating circumstances, and sentenced Trotter to death *Id*.

Trotter appealed. The Florida Supreme Court affirmed Trotter's conviction, but vacated the sentence and remanded for a new penalty phase. *Trotter v. State*. 576 So.2d at 695. The Florida Supreme Court agreed with Trotter's claim that the state trial judge erred in finding that Trotter's being on community control for a previous crime when he robbed and murdered Virgie Langford was a permissible aggravating factor to be weighed in determining Trotter's sentence. *Id*. at 694.

Very soon after *Trotter v. State*, 576 So.2d 691 (Fla. 1991) was decided, "the legislature, in its next regular session, amended § 921.141(5)(a) to specifically address community control." *Id*. The revised subsection stated, in relevant part, that aggravating circumstances included when "[t]he capital felony was committed by a person under sentence of imprisonment or placed on *community control*." *Id*. (emphasis added).

***The Second Penalty Phase, and the Second Direct Appeal***

After the second penalty phase in 1993, the new jury recommended the death penalty by a vote of eleven to one. The state trial court judge, in determining Trotter's sentence, found four aggravating factors, two statutory mitigating factors, and several non-statutory mitigating factors, and sentenced Trotter to death. *Trotter v. State*. 690 So.2d 1234, 1236 n.5-7 (Fla. 1997). One of the aggravating factors was that Trotter was on community control at the time of the robbery and murder. *Id*.

Trotter appealed the second imposition of the second death penalty to the Florida Supreme Court, and raised the following ten issues in his appeal:

---

under a sentence of imprisonment, and therefore could not be considered an aggravating circumstance for purposes of imposing the death penalty. *Id*.

> (1) That the trial court erred in using community control as an aggravating circumstance; (2) that victim impact evidence is generally inadmissible; (3) that admission of such evidence in his case was improper; (4) that he should have been permitted to challenge the validity of his 1985 prior robbery conviction; (5) that the trial court failed to investigate his racial bias claim; (6) that the trial court erred in denying his cause challenges; (7) that the trial court erred in denying a specific cause challenge; (8) that the trial court erroneously admitted evidence of a nonstatutory aggravator; (9) that the prosecutor made improper comments; and (10) that the sentencing order was deficient.

*Id.* at n.8. In 1997, the Florida Supreme Court discussed only the community control issue, simply stating that the rest were 'without merit." The Florida Supreme Court affirmed Trotter's death sentence. *Id.* at 1237.

*The Ex Post Facto Issue*

Trotter claimed that the state trial court's use of community control as an aggravating factor violated his ex post facto rights because the robbery and murder and his first sentencing occurred before the amendment was enacted. *Id.* at 1236.

The Florida Supreme Court held that retroactively applying an aggravating circumstance on Trotter's resentencing was not an ex post facto violation, because amending § 921.141(5)(a) was a "refinement in the 'sentence of imprisonment' factor, not a substantive change in Florida's death penalty law." *Id.* at 1237.

Trotter petitioned the United States Supreme Court for a Writ of Certiorari. The petition was denied. *Trotter v. Florida*, 522 U.S. 876 (1997).

### *Motion for Post Conviction Relief Pursuant to Fla. R. Crim. P. 3.850*

Trotter then filed a Rule 3.850 motion for post conviction relief in the state trial court, raising eight grounds for relief:

> Counsel was ineffective for (1) failing to timely challenge the validity of his prior violent felony conviction and failing to present evidence regarding the circumstances of that prior crime; (2) not having the

assistance of a competent mental health expert; (3) failing to provide mental health experts with available information necessary to their diagnoses of Trotter; and (4) conceding guilt during the guilt phase closing argument. He further alleged that (5) execution by lethal injection or electrocution is unconstitutional; (6) Florida's death penalty sentencing statute is unconstitutional on its face and as applied; (7) the penalty phase jury instructions unconstitutionally shifted the burden to Trotter; and (8) cumulative errors were not harmless.

*Trotter*, 932 So.2d at 1048. The circuit court held an evidentiary hearing on four of the claims, following which it issued an order denying all claims. *Id*.

Trotter appealed the decision on claims 1, 2, and 3 above to the Florida Supreme Court. *Trotter*, 932 So.2d at 1048. While the appeal was pending, Trotter filed a postconviction motion in the state trial court alleging mental retardation. Trotter waived an evidentiary hearing and sought determination of mental retardation. *Id*. The state trial court determined that Trotter was not mentally retarded. *Id*.

Trotter appealed the state trial court order determining that he was not mentally retarded. Trotter claimed he was mentally retarded, and therefore the death sentence was not proportional. *Trotter*, 932 So.2d at 1048-49. In 2006, the Florida Supreme Court per curiam affirmed the state trial court's orders denying postconviction relief. The Florida Supreme Court found that Trotter was not mentally retarded, and that, since he was not mentally retarded, the death penalty was not a disproportionate sentence. *Id*. at 1050. The Florida Supreme Court also held that the ineffective assistance of counsel claims failed because they did not meet the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Trotter*, 932 So.2d at 1051.

Trotter also petitioned the Florida Supreme Court for a writ of habeas corpus, claiming that his death sentence was unconstitutional, and that he might be incompetent at the time of execution. (Ex. D25). The Florida Supreme Court stated that the cases

Trotter used to support his claim did not apply retroactively, and therefore they did not apply in Trotter's case. *Trotter*, 932 So.2d at 1053-54. The Florida Supreme Court also stated that his incompetent-at-time-of-execution claim would not be ripe for review until the governor had signed his death warrant. *Id.*

### 28 U.S.C. § 2254 Petition for Writ of Habeas Corpus

Trotter then timely filed this § 2254 petition for a writ of habeas corpus, raising sixteen grounds for relief.

## STANDARDS OF REVIEW

### 28 U.S.C. Habeas Petitions In General

Trotter filed his petition on October 11, 2006, subsequent to the effective date of the Antiterrorism and Death Penalty Act of 1996 ("AEDPA"), which governs petitions of this type. Consequently AEDPA governs this petition. *Williams v. Taylor*, 529 U.S. 362 (2000); *Peoples v. Campbell*, 377 F.3d 1208 (11th Cir. 2004); *Haliburton v. Secretary for Department of Corrections*, 342 F.3d 1233, 1238 (11th Cir. 2003).

The ADEPA "establishes a more deferential standard of review to state habeas judgments." *Fugate v. Head*, 261 F.3d 1206, 1214 (11th Cir. 2001). This is "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

### Exhaustion of State Court Remedies Required

28 U.S.C. § 2254(b)(1)(A) states, in relevant part:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that -- the applicant has exhausted the remedies available in the courts of the State.

"Exhaustion of state remedies requires that the state prisoner 'fairly presen[t] federal claims to the state courts in order to give the State the *opportunity* to pass upon and correct alleged violations of its prisoners' federal rights.'" *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) (emphasis added).  According to the United States Supreme Court, "it is not sufficient merely that the federal habeas applicant has been through the state courts.... Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies." *Id.* (citing *Picard v. Connor*, 404 U.S. 270, 275 (1971)).  *See also Henderson v. Campbell*, 353 F.3d 880, 891 (11th Cir. 2003) ("A state prisoner seeking federal habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts.") (quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)).

Further, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6-8 (1982). "...the habeas petitioner must have 'fairly presented' to the state courts the 'substance' of his federal habeas corpus claim." *Id.*

### Exhaustion of Remedies

In order to exhaust his state court remedies, a petitioner must invoke at least one complete round of the state's established appellate process. *Henderson*, 353 F.3d at 989 (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)).  This process includes seeking "review by the state's court of last resort, even if review in that court is discretionary." *Pruitt v. Jones*, 348 F.3d 1355, 1358-1359 (11th Cir. 2003) (quoting *O'Sullivan*, 526 U.S.

at 845). This is required even if the state Supreme Court rarely grants such petitions, and usually only answers questions of "broad significance." *O'Sullivan*, 526 U.S. at 845-846.

Habeas relief for procedurally defaulted claims is barred, unless the petitioner can show "cause and prejudice," or that a "fundamental miscarriage of justice" exception is applicable. *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001).

### Petitions Under 28 U.S.C. § 2254(d)

#### Available Grounds for Relief

Pursuant to AEDPA, with respect to a federal claim adjudicated on the merits in state court, habeas relief may not be granted unless adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Price v. Vincent*, 538 U.S. 634, 638 (2003); *Haliburton*, 342 F.3d at 1238. A federal court may not grant habeas relief on the basis of a perceived error of state law, except in extreme cases. *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *McCullough v. Singletary*, 967 F.2d 350, 535-36 (11th Cir. 1992).

Regarding "contrary to" under § 2254(d)(1), according to the Eleventh Circuit:

> "[a] state court decision is "contrary to" clearly established federal law if either (1) the state court applied a rule that contradicts the governing law set forth by Supreme Court case law, or (2) when faced with materially indistinguishable facts, the state court arrived at a result different from that reached in a Supreme Court case.

*Id.* (citing *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001)).

Regarding "unreasonable application" under § 2254(d)(1), according to the Eleventh Circuit:

[a] state court's decision [is] an 'unreasonable application' of federal law if it identifies the correct legal rule from Supreme Court case law, but applies that rule in an unreasonable manner to the facts of petitioner's case. Furthermore, a state court decision that "unreasonably extends, or declines to extend, a governing legal principle (as established by Supreme Court case law) to a new context" also constitutes an unreasonable application of federal law.

*Id.* (citing *Breedlove v. Moore*, 279 F.3d 952, 961 (11th Cir.2002)).

Whether a state court's decision was reasonable must be assessed in light of the record the court had before it. *Holland v. Jackson*, 542 U.S. 649, 652 (2004). "...[A] determination of a factual issue made by a state court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Haliburton*, 342 F.3d 1238.

### Ineffective Assistance of Counsel Claims

"[T]o state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000). "Therefore, the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

"As all the Federal Courts of Appeals have now held, the proper standard for attorney performance is that of reasonably effective assistance." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In order for a convicted defendant to succeed under a claim that counsel's assistance was "so defective as to require reversal of a conviction or death sentence," he must show two things. *Id.* He must first show that

counsel's performance was deficient. *Id.* Second, he must also show that the deficient performance prejudiced the defense. *Id.* "The *Strickland* test provides sufficient guidance for resolving virtually all ineffective-assistance-of-counsel claims." *Williams,* 529 U.S. at 391.

### Harmless Error Rule Applies

"The standard for determining whether habeas relief must be granted is whether the [ ] error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson,* 507 U.S. 619, 622 (1993). "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id.* at 637.

## DISCUSSION

### GROUND ONE

**Reasonable doubt existed in the voir dire record regarding the ability of Juror Woods to render an impartial verdict based solely on the record. The trial court's refusal to [a] grant cause challenge or additional peremptories violated Trotter's rights under the 5th, 6th, and 14th Amendments of the U.S. Constitution. The appellate court's decision upholding this decision is contrary to clearly established federal law or is based upon an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.**

Trotters asserts that the trial court erred when it did not grant a challenge for cause for juror Woods, or grant additional peremptory challenges for the defense, thereby violating his 14th amendment right to due process. (Dkt. No. 10 p. 15-16): (Dkt. No. 16 p. 3-5). According to Trotter, the trial court's rulings resulted in a biased juror serving on the venire, in violation of Trotter's 6th and 14th amendment rights to an impartial jury. (Dkt. No. 10 p. 15-16): (Dkt. No. 16 p. 3-5).

During the first direct appeal, Trotter moved to excuse for cause three prospective jurors: Schmidt, Bradshaw, and Beighle, based on their exposure to publicity. (Ex. A3, p.530-531); (Ex. A4, p. 745-749); (Ex. A3, p. 429-434). Trotter moved to excuse, for cause, a fourth juror, Woods, based on his exposure to publicity and on Wood's inability to follow the law. (Ex. A6, p.1119-1120). All of these challenges were denied. (Ex. A3, p. 543); (Ex. A5, p. 755); (Ex. A3, p. 448); (Ex. A7, p. 1193).

Trotter used four of his ten peremptory challenges to strike those four jurors, subsequently exhausted the remaining peremptory challenges, and then moved for an additional peremptory strike. (Ex. A7, p. 1200). The request was made to replace the peremptory strike Trotter used to strike prospective juror Woods, whom Trotter felt should have been struck for cause upon his earlier request:

> We're moving for an additional peremptory challenge. We feel that, one, in the interest of justice, we should be permitted it; and secondly, had we not had to use up a peremptory on Mrs. Woods, I think we would have been entitled to exercise more discretion in picking the jury. So we're simply asking the court for one additional peremptory challenge.

(Ex. A7, p. 1200). The court denied the motion. *Id.*

*Trotter's 6th and 14th Amendment Right to an Impartial Jury*

The United States Supreme Court has "held that there is no constitutional violation where the biased veniremember does not eventually sit on the jury." *Heath v. Jones*, 941 F.2d 1126, 1132-33 (11th Cir. 1991) (citing *Ross v. Oklahoma*, 487 U.S. 81 (1988). Therefore, to preserve a federal constitutional claim of a violation of his right to an impartial jury, Trotter would have had to raise the claim in state court that a biased juror was actually seated in his guilt phase. *Heath*, 941 F.2d at 1132-33.

According to the Florida Supreme Court, on the first direct appeal. "Trotter [ ] made no such claim." *Trotter v. State*, 576 So.2d at 693. The Florida Supreme Court stated: "In the present case, after exhausting his peremptory challenges, Trotter failed to object to any venireperson who ultimately was seated. He thus has failed to establish this claim." *Id.* "Trotter's request for an additional peremptory challenge was not made in connection with a particular venireperson; it was a general request for a challenge that could be exercised in the future." *Id.* at n. 7. Therefore, this claim is procedurally barred. Trotter has not shown "cause and prejudice" or that a "fundamental miscarriage of justice" will occur if this Court does not reach the merits of the claim.

Further, if Trotter believes that a biased juror were seated, he has not identified which one. Consequently, even if this claim were not procedurally barred, the petition fails to provide sufficient information for this Court to rule on the claim. *U.S. v. Carey*, 571 F.2d 1343, 1344 (5th Cir. 1978) ("When a petitioner simply [states his claim]. and offers no allegations to support that conclusion ... the claim is insufficient to necessitate federal habeas consideration.").

*Trotter's 14th Amendment Right to Due Process*

Federal law allows, alternatively, due process challenges to jury selection, but the "'right' to a peremptory challenge is 'denied or impaired' only if the defendant does not receive that which state law provides." *Ross v. Oklahoma*, 487 U.S. 81, 89 (1988). Similar to federal law, Florida law also requires that an *objectionable* juror actually *be seated*:

> Under Florida law, "[t]o show reversible error, a defendant must show that all peremptories had been exhausted and that an objectionable juror had to be accepted." *Pentecost v. State*, 545 So.2d 861, 863 n. 1 (Fla.1989). By this we mean the following. Where a defendant seeks reversal based on a

claim that he was wrongfully forced to exhaust his peremptory challenges,
he initially must identify a specific juror whom he otherwise would have
struck peremptorily. This juror must be an individual who actually sat on
the jury and whom the defendant either challenged for cause or attempted
to challenge peremptorily or otherwise objected to after his peremptory
challenges had been exhausted. The defendant cannot stand by silently
while an objectionable juror is seated and then, if the verdict is adverse,
obtain a new trial.

*Trotter*, 576 So.2d at 693.

As noted above, the Florida Supreme addressed this claim in 1990:

In the present case, after exhausting his peremptory challenges, Trotter
failed to object to any venireperson who ultimately was seated. He thus
has failed to establish this claim.

*Trotter v. State*, 576 So.2d at 693.

Trotter's state law claim was rejected because Trotter failed to object to any

venireperson who was ultimately seated;  therefore, his federal due process claim must

also fail.  No habeas relief is warranted on ground one.


## GROUNDS TWO, THREE, and FOUR

**Ground Two: Reasonable doubt existed in the voir dire record regarding the ability
of Juror Schmidt to render an impartial verdict based solely on the record. The
trial court's decision to deny Trotter's cause challenge violated his rights under the
5th, 6th, and 14th Amendments of the U.S. Constitution. The appellate court's
decision upholding this decision is contrary to clearly established federal law or is
based upon an unreasonable determination of the facts in light of the evidence
presented at the state court proceeding**


**Ground Three: Reasonable doubt existed in the voir dire record regarding the
ability of Juror Bradshaw to render an impartial verdict based solely on the record.
The trial court's decision to deny counsel's cause challenge violated his rights under
the 5th, 6th, and 14th Amendments of the U.S. Constitution, and the appellate
court's decision upholding the trial court was an unreasonable application of clearly
established federal law or based upon an unreasonable determination of the facts in
light of the evidence presented at the state court proceeding**

**Ground Four: Reasonable doubt existed in the voir dire record regarding the ability of Juror Beighle to render an impartial verdict based solely on the record. The trial court's decision to deny Trotter's cause challenge violated his rights under the 5th, 6th, and 14th Amendments of the U.S. Constitution and the appellate court's decision upholding the trial court was an unreasonable application of clearly established federal law or based upon an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.**

As in ground one, Trotter asserts that the trial court erred when it did not grant a challenge for cause for jurors Schmidt, Bradshaw, and Beighle, respectively, or grant an additional peremptory challenge to the defense. (Dkt. No. 10 p. 17-25); (Dkt. No. 16 p. 5-11). According to Trotter, this violation of his right resulted in a biased juror serving on the venire. in violation of his 6th and 14th amendment right to an impartial jury. (Dkt. No. 10 p. 17-25); (Dkt. No. 16 p. 5-11).

The arguments in grounds two, three. and four are similar to that in ground one. except that the prospective juror is a different person in each ground. Grounds two. three. and four are based solely on the juror's exposure to publicity. The analysis in ground one is devoid of reference to the prospective juror. Therefore. the conclusions reached in ground one are going to apply equally to grounds two, three, and four. Ground one is procedurally barred. therefore grounds two. three. and four are procedurally barred. Trotter has not shown "cause and prejudice" or that a "fundamental miscarriage of justice" will occur if this Court does not reach the merits of the claim. Therefore. no habeas relief is warranted on grounds two, three. or four.

## GROUND FIVE

**Use of Florida Statute Section 921.141(5)(a) (committed by a person on community control) as a basis to justify the death penalty violates the Ex Post Facto clause, Article I, Section 10 or the United States Constitution because Trotter's crime occurred in 1986 and at the time of his sentencing in 1987 this aggravator did not exist. In upholding the trial court, the appellate court's decision is contrary to, or involved an unreasonable application of clearly established Federal law.**

Trotter asserts that the state court trial judge's 1993 finding that Trotter's being under community control for a previous crime was an aggravating factor under Florida Statute Section 921.141(5)(a)(1990), for a crime committed in 1986, violated the *Ex Post Facto* clause, Article I, Section 10 of the United States Constitution. (Dkt. No. 10, p. 25-27); (Dkt. No. 16, p. 11-17).

Subsection 921.141(5)(a), Florida Statutes (1985), governed aggravating circumstances at the time of Trotter's first sentencing. The statute stated in relevant part: "Aggravating circumstances shall be limited to the following: (a) The capital felony was committed by a person under sentence of imprisonment."

Trotter objected to the use of community control as an aggravating factor in his direct appeal to the Florida Supreme Court in 1990. *See Trotter v. State*, 576 So.2d at 691. The Florida Supreme Court upheld his conviction, but agreed that "...it was error to consider his violation of community control as an aggravating factor in sentencing." *Id.* at 694. The Florida Supreme Court held that community control was not an aggravating factor authorized by statute and remanded for resentencing before a jury. *Id.* at 695.

In its next regular session, which was immediately after that 1990 Florida Supreme Court decision, the Florida legislature amended § 921.141(5)(a) to specifically include community control as an aggravating factor. Fla. Stat. § 921.141(5)(a)(1991). At the 1993 resentencing, the jury again recommended the death penalty, this time in an eleven-to-one vote, and the judge imposed the death sentence. *Trotter v. State*, 690 So.2d 1234, 1236 (Fla. 1996). In light of the amended statute, the sentencing judge found Trotter's community control to be an aggravating factor. *Id.* Trotter appealed this

finding to the Florida Supreme Court as an ex post facto violation, because the crime and initial sentencing took place before the amendment to § 921.141(5)(a) was enacted.

In 1996 the Florida Supreme Court found no ex post facto violation because the amendment to FL. Stat. 941.121(5)(a) was a "refinement in the 'sentence of imprisonment' factor, not a substantive change in Florida's death penalty law." *Trotter*, 690 So.2d at 1237. The Florida Supreme Court noted that it "found no violation in every other case where an aggravating circumstance was applied retroactively, even on resentencing." *Id.*

Trotter raises this claim pursuant to the United States Constitution, Article I, Section 10, which states, in relevant part, "No State shall...pass any...ex post facto law." U.S. Const. art. I, § 10 cl.1. *Collins v. Youngblood*, 497 U.S. 37, 51 (1990) was ex post facto precedent in effect at the time of Trotter's second direct appeal to the Florida Supreme Court. In *Collins*, the United States Supreme Court held that laws that "punish as a crime an act previously committed, which was innocent when done, [ ] make more burdensome the punishment for a crime, after its commission, []or deprive[ ] one charged with crime of any defense available according to the law at the time when the act was committed" constitute ex post facto violations. *Id.* Trotter claims that using the law that allowed community control to be an aggravating factor during his sentencing, which was enacted after his crime was committed, was an ex post violation, because it "made more burdensome the punishment for a crime." *Id.*

In *Collins*, the United States Supreme Court analyzed the history of the doctrine back through *Calder v. Bull*, 3 Dall. 386 (1798). Through that analysis it arrived at the three situations, listed above, to which the ex post facto clause applied, including a

retroactive increase in the punishment for a crime. *Collins*, 497 U.S. at 51. "The central concerns of the ex post facto clause [are] 'the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated.'" *Lynce v. Mathis*, 519 U.S. 433, 441 (1997) (citing *Weaver v. Graham*, 450 U.S. 24. 30 (1981)).

It follows that whether an ex post facto violation exists due to the retroactive application of a punishment enhancing statute turns on whether sufficient notice regarding the *potential* punishment. when imposed, existed in the statute that was in effect at the time the crime was committed ("original statute"). *Dobbert v. Florida*, 432 U.S. 282 (1977) ("ex post facto clause looks to the standard of punishment prescribed by a statute, rather than to the sentence actually imposed."). Accordingly, if the revised statute provided for punishment that the original statute *did* provide notice for, then there was no ex post facto violation because there was no unexpected punishment. If, however, the revised statute provided for punishment that the original statute *did not* provide notice for, then its application was an ex post facto violation. The answer turns on whether *notice* for the maximum *potential* punishment was provided by the original statute.

Florida's Approach

In the 1996 second direct appeal. the Florida Supreme Court took the new position that the Florida legislature intended community control to be included under "sentence of imprisonment" when the statute was enacted. *Trotter*, 690 So.2d at 1236. Since community control was a sentence of imprisonment, and since being under a sentence of imprisonment was an aggravating factor, the Florida Supreme Court held that

it was proper for the first sentencing judge to have considered it during sentencing. *Id.*
In essence, the Florida Supreme Court was saying that the original statute gave notice to
Trotter of the punishment he *could* face if he committed that crime while under
community control, because the original statute said "sentence of imprisonment," and
that was meant to include community control.

The Florida Supreme Court stated this in spite of its first ruling on the issue in
1990, that community control was not a "sentence of imprisonment." *Trotter v. State*,
576 So.2d at 694. The 1996 Florida Supreme Court held that it had misinterpreted the
meaning of the words "under sentence of imprisonment" in the first direct appeal in 1990.
*Trotter*, 690 So.2d at 1236. The Florida Supreme Court reached this conclusion because,
the court said, the subsequent legislative amendment, which added community control as
an aggravator, made it clear to the court that the original intent of the legislature was to
include community control, and the legislature had essentially not written the statute
clearly. *Id.* Consequently, the amendment did not add a new aggravator, it simply
"refined" the statute which was meant to include community control all along. *Id.*
Therefore, the Florida Supreme Court reasoned, since there was no new aggravator, the
potential punishment Trotter faced at resentencing was not greater than what he faced
when he committed the crime, and thus there was no ex post facto violation. *Id.* Again,
the Florida Supreme Court concluded that the original statute and the revised statute both
provided notice of his potential punishment, hence there was no ex post facto violation.

The dissenting opinion in the second direct appeal in 1996 points out, however,
that the statute in question was created in 1972, eleven years before the creation of
community control in 1983. *Id.* at 1238 (Anstead, J., dissenting). That being the case,

the dissent notes, it is hard to believe that the legislature intended to include community control as a sentence of imprisonment, in that it did not exist when the legislature drafted the statute. *Id.* The dissent contends that since the legislature could not have intended to include community control as an aggravating factor, it was a new aggravator. *Id.*

That being the case, the dissent contends, a person could, in theory, be subject to a greater punishment under the revised statute than he was under the original statute. *Id.* To make his point the dissent contemplated a theoretical defendant much like Trotter, but whose only aggravating factor was being on community control at the time of the crime. *Id.* at 1239. This defendant's potential sentence could be elevated from a life sentence, to a death penalty, based on the new aggravator. *Id.* However, such an elevation would not have been possible under the original statute. *Id.* Since the theoretical defendant would not have had notice that being on community control could elevate his punishment, as community control was a new aggravator, application of the revised statute would be an ex post facto violation. *Id.* In terms of notice, the dissent was saying that under certain circumstances the revised statute provided for a potential punishment that the original statute did not provide notice for. *Id.* Therefore, its retroactive application would be an ex post facto violation, regardless of whether it actually resulted in an increased sentence. *Id.*

Federal Approach

The United States Supreme Court discussed its *Collins* approach to ex post facto analysis in *California Dept. of Corrections v. Morales*, 514 U.S. 499, 506 n.3 (1995) (italic emphasis in original, underlined emphasis added):

> Our opinions in *Lindsey. Weaver*, and *Miller* suggested that enhancements to the measure of criminal punishment fall within the *ex post facto*

prohibition because they operate to the "disadvantage" of covered offenders. See *Lindsey*, 301 U.S. at 401, 57 S.Ct., at 799; *Weaver*, 450 U.S. at 29, 101 S.Ct., at 964; *Miller*, 482 U.S. at 433, 107 S.Ct., at 2452-53. But that language was unnecessary to the results in those cases and is inconsistent with the framework developed in *Collins v. Youngblood*, 497 U.S. 37, 41, 110 S.Ct. 2715, 2718, 111 L.Ed.2d 30 (1990). After *Collins*, the focus of the ex post facto inquiry is not on whether a legislative change produces some ambiguous sort of "disadvantage," nor, as the dissent seems to suggest, on whether an amendment affects a prisoner's " *opportunity* to take advantage of provisions for early release," see post, at 1607, but on whether any such change alters the definition of criminal conduct <u>or increases the penalty by which a crime is punishable.</u>

In order to determine if retroactive application of the statute to Trotter was an ex post facto violation, the initial question to be addressed is what exactly the United States Supreme Court meant when it said "makes more burdensome the punishment for a crime" in *Collins*. *Dobbert v. Florida*, 432 U.S. 282 (1977) limits discussion to the standard of punishment prescribed by statute, not that the individual is actually sentenced to.

A distinction must be noted between what an individual *is* sentenced to, what *he can be* sentenced to, and what the *absolute maximum penalty* for the statute can be. *Dobbert*, 432 U.S. at 299. For that reason, three separate scenarios exist to which the phrase "make[s] more burdensome the punishment for a crime" could be applied, which might explain some of the lack of consensus that surrounds it.

First and most obviously, there is the scenario where the maximum punishment for a particular crime is increased. For example, albeit extreme, the punishment for a crime that did not include the death penalty could be revised to include the death penalty for every violator. Retroactive application of this statute would be an obvious ex post facto violation for every violator, because there was no notice that such a punishment could have been imposed when the violator committed the crime

Second is the scenario where, while the maximum punishment for a crime is not itself increased, the statute is revised such that the maximum punishment that a particular individual faces would increase, depending on the facts of the case, while the maximum punishment for other individuals would not increase.  For example, a statute is revised to mandatorily apply the death penalty to an offender if he was on community control at the time of a murder, and no other statutory enhancements existed or were created.  In that case, which is similar to Justice Anstead's theoretical example in the dissent in *Trotter*, 576 So.2d at 1238, the penalty for certain offenders would be increased, but it would not be increased for all offenders.  Clearly this individual's own punishment would be increased due to the retroactive application of the statute.  Whether it was an ex post facto violation would depend on the individual affected, and whether notice was sufficient under the original statute.

Third, and the scenario that exists in the instant case, is the scenario where the maximum punishment for the crime itself is not increased, but the statute is revised in such a manner that particular individuals face increased *chances* of being sentenced to the maximum punishment.  In the case of Florida law, the jury weighs the aggravating factors against the mitigating factors, and then may or may not recommend the death penalty, based on the net effect of all of the factors.  Fla. Stat. § 941.121(2).  Trotter had four aggravating factors, two statutory mitigating factors, and several non statutory mitigating factors.  *Trotter*, 690 So.2d at 1236.  Had the revised statute not been applied retroactively, Trotter would have faced three aggravating factors, instead of four.  Trotter could still have been sentenced to death with three aggravating factors.  The retroactive application of the revised statute *might* have increased his *chances* of receiving the death

penalty. Whether it was the dispositive factor. or even a factor at all. given that there were three other factors, together with the nature of the case, will never be known. At best Trotter can argue that he *might* not have received the death penalty. He cannot argue that he definitely would not have received the death penalty. Thus. one complexity of the punishment issue – was Trotter's punishment "made more burdensome" by the retroactive application of the statute simply because he faced an increased chance at receiving the death penalty?

Therefore, in order to determine if the application of community control as a new aggravator was an ex post facto violation, this Court must first look to see if Trotter's punishment was considered "more burdensome" under *Collins*. when he faced only *increased chances* at the maximum punishment because of the new aggravator. Second. if his punishment is considered more burdensome, this Court must determine if the original statute gave sufficient notice to encompass the revised statute.

Does An Increase In The Chance Of Receiving An Increased Sentence Constitute "More Burdensome" Under *Collins*?

In determining if changes due to legislative revision will be sufficient to violate the ex post facto clause, the United States Supreme Court has

> long held that the question of what legislative adjustments "will be held to be of sufficient moment to transgress the constitutional prohibition" must be a matter of "degree." *Beazell*, 269 U.S. at 171, 46 S.Ct., at 69. In evaluating the constitutionality of the 1981 amendment, we must determine whether it produces a sufficient risk of increasing the measure of punishment attached to the covered crimes. We have previously declined to articulate a single "formula" for identifying those legislative changes that have a sufficient effect on substantive crimes or punishments to fall within the constitutional prohibition, see ibid., and we have no occasion to do so here. The amendment creates only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes, and such conjectural

> effects are insufficient under any threshold we might establish under the
> Ex Post Facto Clause. See *Dobbert*, supra, 432 U.S. at 294, 97 S.Ct., at
> 2299 (refusing to accept "speculation" that the effective punishment under
> a new statutory scheme would be "more onerous" than under the old one).

*Morales*, 514 U.S. at 509.

Consequently, in order to determine if Trotter's 1986 ex post facto rights were

violated under the Florida sentencing scheme, this Court must decide if there was "a

sufficient risk" that his punishment could have been increased. Under the first scenario

above all violators faced an increased penalty, inherently passing the sufficient risk test.

Under the second scenario mentioned above, where an a statutory change resulted in a

particular individual's maximum possible sentence being elevated from life to the death

penalty, it is still clear that there would be a sufficient risk that his punishment would be

elevated.

However, in the third scenario, which is trotter's situation, whether there is a

significant risk that his sentence could be increased is not nearly so clear cut. The United

States Supreme Court has analyzed the issue in states that weigh aggravating and

mitigating factors ("weighing states"), such as Florida, and has held:

> In a weighing State, therefore, the sentencer's consideration of an invalid
> eligibility factor necessarily skewed its balancing of aggravators with
> mitigators, *Stringer*, 503 U.S. at 232, 112 S.Ct. 1130, and required
> reversal of the sentence (unless a state appellate court determined the error
> was harmless or reweighed the mitigating evidence against the valid
> aggravating factors), ibid.

*Brown v. Sanders*, 546 U.S. 212, (2006) (citing *Stringer v. Black*, 503 U.S. 222 (1992).

*Brown* was not in effect during the 1996 sentencing, but *Stringer* was, so *Stringer* applies

to Trotter. Therefore, his increased chance at receiving an increased maximum

punishment constitutes "more burdensome" under *Collins*.

This result also follows, under Florida law, from the Florida Supreme Court's decision to remand after the first direct appeal. It remanded based on the use of a constitutionally impermissible aggravating factor. The sentencing judge's consideration of the improper aggravator only served to increase Trotter's chances that he receive the death penalty. This is so because he was already facing the death penalty due to the presence of three other aggravators. He was not facing an increased maximum penalty, just an increased chance at the maximum penalty he was already facing. The Florida Supreme Court held, in the first direct appeal, that an increased chance at receiving the death penalty due to the retroactive application of a penal statute rose to an ex post facto violation, though it did not explicitly mention ex post facto language. It is implicit in this action that the Florida Supreme Court believed that facing an increased chance at the death penalty constituted making the penalty "more burdensome" under *Collins*.

Were The Facts Underlying The Other Aggravators The Same As For Community Control?

In *Francis v. Dugger*, 908 F.2d 696 (11th Cir. 1990), decided before Trotter's resentencing, the Eleventh Circuit considered a situation similar to Trotter's. In *Francis*, the Florida legislature created a new aggravator, "cold, calculated, and premeditated," to the list of factors that a sentencing court could consider. *Id*. Similar to Trotter's community control legislation, the new aggravator was added after Francis' crime, but considered in his subsequent sentencing, and was included with Francis' other aggravators in his sentencing. *Id* at 705.

The Eleventh Circuit found no ex post facto violation because, using the *Miller* and *Weaver* framework, which has since been modified by *Collins*, the defendant was not

disadvantaged. The Eleventh Circuit agreed with the district court's analysis: 1) the facts considered by the judge under the cold, calculated, and premeditated aggravator were the same facts considered by the judge under existing aggravators, and 2) "[t]he Florida sentencing scheme is not founded on 'mere tabulation' of aggravating and mitigating factors, but relies instead on the weight of the underlying facts." *Id.* at 705. Though it was not operating under the *Collins* framework, as this Court must, the method of analysis still proves helpful because it can also be applied to our notice discussion.

The Eleventh Circuit was saying that the facts that constituted the aggravators in the original statute were the same facts that constituted the new aggravator, which the jury would have heard. Hence, there was no disadvantage to the defendant. *Id.* By implication, this means that notice was given through the original statute sufficient to cover the potential punishment he could receive under the new statute. This is so because his same criminal actions that were covered by the original aggravators subjected him to the death penalty, so the application of the third aggravator did not increase his possible punishment. Hence, no ex post facto violation under the *Collins* framework.

The other aggravating factors in Trotter's case were that he had a prior violent felony conviction, that he committed this murder in the course of a robbery and for pecuniary gain, and that the murder was especially wicked, evil, atrocious, and cruel. *Trotter*, 690 So.2d at 1234. Trotter's status of being on community control was the result of his prior violent felony conviction. However, that the judge knew of Trotter's prior violent felony did not mean that the judge necessarily knew Trotter was on community control, because the underlying facts are different from each other. The facts underlying having committed the murder during a robbery and for pecuniary gain, and that the

murder was especially wicked, evil, atrocious, and cruel, are also unrelated to the facts underlying his status of being on community control as well. Since the underlying facts are different, the judge would not have been aware of the community control due to the judge's awareness of the other aggravating factors, so community control was an aggravator that considered new facts, and thus the question is whether the original statute provided sufficient notice to encompass the revised statute.

Did the Original Statute Provide Sufficient Notice?

Florida's argument, in terms of notice, was that community control was always intended to be included under the terms "sentence of imprisonment." Therefore the original statute provided sufficient notice, and thus its inclusion for consideration was appropriate, regardless of whether it increased *Trotter's* punishment. *Trotter*, 690 So.2d at 1236-38. The Florida Supreme Court based this conclusion on "the specificity and promptness of the 1991 amendment to section 921.141(5)(a) and in view of our prior case law giving retroactive application to other aggravating circumstances effecting a refinement in the law..." *Id.* at 1237. It should be noted that in the following years the Florida Supreme Court has found the retroactive application of felony probation as an aggravating factor was an ex post facto violation, as it was a new aggravating factor, which, in terms of notice, was not provided for in the original statute. See *Lukehart v. State*, 762 So.2d 482 (Fla.2000); *Zack v. State*, 753 So.2d 9 (Fla.2000). Again, the distinction lies in what was a "refining" of the existing law, as in the case of community control, where notice was provided by the original statute, and changing the substantive law by adding a new aggravator, such as felony probation, where no notice existed in the original statute.

The original wording of the statute, "under sentence of imprisonment," was ambiguous enough to cause the Florida Supreme Court, in the first direct appeal, to reach a conclusion about the meaning of the phrase that the Florida Supreme Court stated during the second direct appeal was incorrect. *Trotter v. State*, 690 So.2d at 1236-38. In the first direct appeal, the Florida Supreme Court correctly applied the rule of lenity, which requires the interpretation of ambiguous statutes in favor of the accused. *See Staples v. United States*, 511 U.S. 600, 619. n. 17, (1994). On the second direct appeal the Florida Supreme Court essentially said that the statute was not ambiguous as originally worded, because the Florida Supreme Court learned what the phrase meant in the meantime, via the legislative revision. *Trotter*, 690 So.2d at 1237. To conclude that the original statute was unambiguous was inherently contradictory, because the Florida Supreme Court itself, the State's highest authority on the interpretation of Florida law, apparently misconstrued the meaning of an unambiguous statute. If the highest authority in the state misconstrued the meaning of the statute, then that statute was the quintessential example of an ambiguous statute.

The question then becomes whether a criminal statute that is ambiguous with respect to what qualifies someone for the maximum punishment for a crime provides the amount of notice required to avoid an ex post facto violation. In Trotter's case specifically, the question is whether the words "sentence of imprisonment" would naturally include community control. The specific question becomes whether someone who was on community control, who read the words "sentence of imprisonment" in the statute, would be on notice that if he committed murder, his chances of being sentenced

to death would be increased because he was on community control at the time he committed the murder.

The resolution to the ex post facto question is a question of the sufficiency of the notice of the original statute, a due process issue. If due process notice regarding the maximum possible punishment under the original statute was sufficient, despite the ambiguous language, then the revised statute, which was not ambiguous, simply provided more notice than is constitutionally required.

The United States Supreme Court has held that due process requires statutes that define criminal activity and punishment must define it clearly. *U.S. v. Batchelder*, 442 U.S. 114, 123 (1979) ("So long as overlapping criminal provisions *clearly* define the conduct prohibited and the punishment authorized, the notice requirements of the Due Process Clause are satisfied.") (emphasis added); *Reno v. Koray*, 515 U.S. 50, 64 (1995) ("The rule of lenity applies only if, 'after seizing everything from which aid can be derived...we can make 'no more than a guess as to what Congress intended.'") (internal citations omitted); *U.S. v. R.L.C.*, 503 U.S. 291, 305 (1992) ("If different interpretations of an ambiguous statute, resulted in differing punishments, 'we would choose the construction yielding the shorter sentence by resting on the venerable rule of lenity.'").

FL. Stat. 141.121(5)(a)(1985) was ambiguous because it was actually misinterpreted. *Trotter*, 576 So.2d at 691. The ambiguous wording in the statute, "under sentence of imprisonment" had two possible meanings with respect to community control: either it was meant to include community control, or it was not. If the question of whether the meaning of the statute was clear had been raised, United States Supreme Court precedent in effect when Trotter committed his crime would have required courts

to choose the lesser punishment. *R.L.C.*, 503 U.S. at 305. That means the federal rules of statutory interpretation would have resulted in the exclusion of community control as an aggravating factor, because the lack of clarity of the statute did not provide sufficient notice as to the maximum possible punishment, a due process requirement.

The original statute did not provide sufficient notice that Trotter faced a greater chance of the maximum possible punishment as a result of Trotter's being under community control. However, the retroactive application of community control as an aggravating factor increased Trotter's chances that he could face the death penalty.

To the extent that the Florida Supreme Court held that an original statute can provide notice sufficient to encompass a revised statute, Florida's decision is in accord with United States Supreme Court precedent. That FL. Stat. 921.141(5)(a)(1985) provided Trotter with sufficient notice to encompass FL. Stat. 921.141(5)(a)(1991) is not in accord with United States Supreme Court precedent. The Florida Supreme Court identified the correct legal rule regarding notice for ex post facto violations, but applied it in an unreasonable manner, finding notice where there was none. However, any error was cured by the state trial court when it found that there were three other aggravating factors, and reweighed, excluding community control from consideration. Even had it not been cured, it would have been harmless error.

Through *Stringer*, "[w]hen the weighing process itself has been skewed, only constitutional harmless-error analysis or reweighing at the trial or appellate level suffices to guarantee that the defendant received an individualized sentence." *Stringer*, 502 U.S. at 232. *Stringer* allows the trial court itself to conduct a reweighing. The resentencing judge did just that when he specifically noted in his order that he would have imposed the

same penalty with or without the community control aggravator: "although the state was permitted to introduce evidence of this factor, this court would have reached the same conclusion without this evidence." (Ex. B3, p. 543-544). By way of that reweighing, the error was cured.

Had there not been such an analysis, pursuant to habeas "collateral review" standards, this Court would be required to determine if the error "had substantial and injurious effect or influence in determining the jury's verdict" before granting habeas relief. *Abrahamson*, 507 U.S. at 637. Only if Trotter suffered actual prejudice could this Court grant habeas relief. *Id.*

As noted above, at resentencing Trotter had four aggravating factors, two statutory mitigating factors, and several non statutory mitigating factors. *Trotter*, 690 So.2d at 1236. One aggravating factor, that Trotter was engaged in a robbery and was for pecuniary gain, was written separately by the trial court in its written order, though it was considered as one aggravator. *Id.* Had the revised statute not been applied retroactively, Trotter would have faced three aggravating factors, instead of four. Trotter could still have been sentenced to death with three aggravating factors.

The jury voted 11-1 to recommend the death penalty at Trotter's resentencing. *Id.* Further, if the fourth mitigating factor were removed and the factors were balanced by totals, as opposed to weighing as the Florida system does, there were still more statutory aggravators than statutory mitigating factors. Also, the significance of the aggravator in question, whether Trotter was on community control when he committed the crime, pales in comparison to the other aggravators. For example, the aggravator that Trotter had been convicted of a violent felony is far more influential than the community control

aggravator. It is the same factor that caused him to be under community control in the first place. The aggravator that the crime took place while Trotter was engaged in a robbery and for pecuniary gain again is intuitively more influential than whether he was on community control. Finally, the aggravator that his murder, by strangling and repeatedly stabbing a completely innocent 70 year old lady while she was working in her grocery, ready to help him, to the point where he disemboweled her, was especially wicked, evil, atrocious, and cruel, needs no further explanation.

Any error regarding the use of community control as an aggravator was cured by the state trial court when the state trial court conducted a reweighing of the facts, excluding community control from consideration. Further, even if there had been no such reweighing, any error did not have a "substantial and injurious effect or influence in determining the jury's verdict," as required for habeas relief. *Abrahamson*, 507 U.S. at 637. Therefore, habeas relief is not warranted under ground five.

## GROUND SIX

**Florida Statutes, Section 921.141(7), (1993) (Allowing Introduction of Victim Impact Evidence) was applied when Trotter was re-sentenced in 1993 but was inadmissible at the time of his original trial, conviction and sentencing. Application of a provision that was impermissible at the time of the original trial constitutes an Ex Post Facto law violation of Federal U.S. Constitutional Law (Art. I §9, §10). The trial court's decision was contrary to or resulted in an unreasonable application of clearly established Federal law based on the facts of the case.**

Trotter asserts that the trial court's use of victim impact evidence, in the form of "eulogistic testimony about the victim," pursuant to Fla. Stat 921.141(7)(1993), violated his ex post facto rights under Article I, Section 10 of the United States Constitution, because the law was enacted in 1993, but Trotter's crime occurred in 1986. (Dkt. No. 10 p. 27-30); (Dkt. No. 16 p. 18-19).

Similar to ground five, Trotter raises this claim pursuant to the United States Constitution, Article I, Section 10, which states, in relevant part, "No State shall…pass any…ex post facto law." U.S. Const. art. I, § 10 cl.1. In *Collins v. Youngblood*, 497 U.S. 37, 51 (1990), the United States Supreme Court held that laws that "punish as a crime an act previously committed" cannot be applied retroactively.

Trotter claims that "although the victim impact statement does not create a new aggravating factor, it still allows evidence, previously barred, to be weighed in aggravation by the sentencer. (Dkt. No. 16 p.18). In terms made familiar through ground five, Trotter's claim is that his chance at receiving the maximum punishment for his crime was increased, in violation of *Collins*, due to the use of additional prejudicial evidence.

Florida's Approach

Florida declined to address the issue, other than to say it was meritless. *Trotter*, 690 So.2d 1237. However, the Florida Supreme Court's reasoning underlying its position that introduction of victim impact evidence was not an ex post facto violation is made clear in *Windom v. State*:

> Defendant's second attack on the victim impact evidence concerns the application of 921.141(7) to defendant's crime. He claims that such application was a violation of the ex post facto clauses of the United States and Florida Constitutions since the murders were on February 7, 1992, and subsection seven of section 921.141 did not go into effect until July 1, 1992. We do not agree. To the contrary, we approve the Fourth District Court of Appeal's decision on this point in *State v. Maxwell*, 647 So.2d 871 (Fla. 4th DCA 1994), in which the district court found our decision in *Glendening v. State*, 536 So.2d 212 (Fla.1988), cert. denied, 492 U.S. 907, 109 S.Ct. 3219, 106 L.Ed.2d 569 (1989), to be instructive. Section 921.141(7) only relates to the admission of evidence and is thus procedural. *Id.* at 215. Therefore, application of section 921.141(7) in the present case does not violate the prohibition against ex post facto laws.

*Windom v. State*, 656 So.2d 432 (Fla. 1995).

Federal Approach

The question of whether changes in evidentiary rules constitute an ex post facto violation was addressed in *Collins*. In *Collins*, the Court referred to *Beazell v. Ohio*, 269 U.S. 167 (1925), which omitted "alterations to legal rules of evidence," originally mentioned in *Calder*, in 1798, as one of the areas governed by ex post facto laws. *Collins*, 497 U.S. at 43.  Per the *Collins* Court:

> As cases subsequent to *Calder* make clear, this language *was not intended to prohibit the application of new evidentiary rules in trials for crimes committed before the changes. Thompson v. Missouri*, 171 U.S. 380, 386-387, 18 S.Ct. 922, 924-925, 43 L.Ed. 204 (1898) (rejecting ex post facto challenge to retroactive application of statute making admissible handwritten documents as handwriting exemplars.

*Id.* (emphasis added).

Prior to *Collins* the courts were making distinctions as to whether a law was procedural or substantial. *Id.* at 43-45.  Procedural laws were not subject to ex post facto violations, while substantive laws were. *Id.*  The *Collins* decision clarified the laws which are subject to the ex post facto clause. The United States Supreme Court said:

> We think the best way to make sense out of this discussion in the cases is to say that by *simply labeling a law "procedural," a legislature does not thereby immunize it from scrutiny under the Ex Post Facto Clause*. See *Gibson v. Mississippi*, 162 U.S. 565, 590, 16 S.Ct. 904, 910, 40 L.Ed. 1075 (1896). *Subtle ex post facto violations are no more permissible than overt ones*. In *Beazell*, supra, we said that the constitutional prohibition is addressed to laws, "whatever their form," which make innocent acts criminal, alter the nature of the offense, or *increase the punishment. Id.*, 269 U.S. at 170, 46 S.Ct. at 68-69.

*Collins*, 497 U.S. at 46 (emphasis added).

In *Windom*, the Florida Supreme Court held that the retroactive application of victim impact testimony was not an ex post facto violation because the statute only

related to the admission of evidence. *Windom*, 656 So.2d at 439. Consequently, it was procedural, and outside the scope of ex post facto consideration. *Id.* The Florida Supreme Court cited with approval *State v. Maxwell*, where the Florida Fourth District Court of Appeal said that the admission of victim impact evidence "does not purport to affect personal rights as it relates only to the admission of evidence." *State v. Maxwell*, 647 So.2d 871 (Fla. 4th DCA 1994). Both of those cases relied on *Glendening v. State*, 536 So.2d 212, 215 (Fla. 1988). The *Glendening* court stated "No ex post facto violation occurs if a change is merely procedural and does not alter 'substantial personal rights.'" *Id.* However, *Glendening* was citing *Miller*, 107 S.Ct. at 2451, and *Dobbert*, 432 U.S. at 293, for these propositions. *Id. Miller* was a 1987 ruling, and *Dobbert* was a 1977 ruling. *Collins* was a 1990 ruling, and thus *Collins* governs.

The Florida Supreme Court has labeled victim impact evidence procedural. *Glendening*, 536 So.2d at 215. By "simply labeling a law "procedural," a legislature does not thereby immunize it from scrutiny under the Ex Post Facto Clause. *Collins*, 497 U.S. at 46. "[W]e have said that a procedural change may constitute an ex post facto violation if it "affect[s] matters of substance by depriving a defendant of 'substantial protections with which the existing law surrounds the person accused of crime'" *Id.* at 45 (citing *Beazell*, 269 U.S. at 171).

The federal analysis thus returns to whether Trotter faced an increased chance of receiving the death penalty as a result of the introduction of victim impact evidence. Evidence that is presented to establish guilt, is distinguishable from evidence that is presented to determine punishment. In a weighing state, victim impact evidence that is presented for a jury to consider when determining the punishment is likely to increase the

chances that a defendant is going to face the maximum penalty. Victim impact evidence
is directly weighed among limited aggravators and all mitigating factors. Rarely can such
evidence do anything but increase the defendant's chances that he will be sentenced to
the maximum penalty.

Consequently, since facing an increased chance of receiving the death penalty
constitutes making the punishment "more burdensome" under *Collins*, and also per the
Florida Supreme Court implicitly, retroactive application of the law that allowed victim
impact evidence at sentencing was not in accord with United States Supreme Court
precedent at the time. However, any error was cured, and even if it had it not been cured,
it was harmless pursuant to *Abrahamson*.

The state trial judge stated: "Victim impact [evidence] was not allowed to become
a focal point in the sentencing proceeding *nor has it influenced the court in reaching its
decision*." (Ex. B3, p. 543) (emphasis added). This statement is sufficient to constitute a
curative reweighing permitted by *Stringer*.

Further, any error was harmless under *Abrahamson*. As noted above, at
resentencing Trotter had four aggravating factors, two statutory mitigating factors, and
other non statutory mitigating evidence. *Trotter*, 690 So.2d at 1236. Trotter notes that
the State presented the victim's grandson, and son-in-law, to testify to victim impact
evidence. (Ex. B20, p48). Both presented evidence that painted the victim in a favorable
light as a woman of family and community. It is no surprise that such a seventy year old
lady would have family who cared for her, and people who relied on her. Such
information is fairly intuitive, and not likely something that the jury had not already
thought of.

Given the evidence before the new jury, and its eleven-to-one vote in favor of the death penalty, the addition of the victim impact evidence did not have a "substantial and injurious effect or influence in determining the jury's verdict" and any error was harmless. *Abrahamson*, 507 U.S. at 637. Therefore, habeas relief is not warranted on ground six.

### GROUND SEVEN

**The Florida Supreme Court remanded Trotter's case for re-sentencing without application of community control as an aggravator. Prior to Mr. Trotter's sentencing the Legislature amended the statute to include this factor as a proper aggravator. The Legislature effectively overruled a decision issued by the Florida Supreme Court in violation of the Separation of Powers Clause recognized in Articles I, II, and III of the United States Constitution. The trial and appellate court's decision to apply the aggravator to Trotter under these circumstances was contrary to, or involved an unreasonable application of clearly established Federal law and resulted in a decision that was based on an unreasonable determination of the facts presented.**

Trotter asserts that when the sentencing judge used community control as an aggravator during his resentencing, despite the Florida Supreme Court's ruling that community control not be considered, he permitted the legislature's revision to the statute to overrule the Florida Supreme Court's remand order. (Dkt. No. 10 p. 30-32); (Dkt. No. 16, p. 19-20). This, Trotter claims, permitted the legislature to encroach on the judiciary's power, a violation of the separation of powers doctrine. (Dkt. No. 10 p. 30-32); (Dkt. No. 16, p. 19-20).

In his petition Trotter claims that he raised this issue during his second direct appeal. (Dkt. No. 10 p. 31). However, the only mention of the separation of powers issue appears under "Issue One" as one line in the Initial Brief of Appellant in his second direct appeal. Therefore, this claim is procedurally barred. Further, Trotter has not

shown "cause and prejudice" or that a "fundamental miscarriage of justice" will occur if this Court does not reach the merits of the claim.

Even if ground seven were not procedurally barred, this claim does not warrant any relief. In ground five, this Court has already determined that use of community control as an aggravating factor did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Abrahamson*, 507 U.S. at 637. Therefore, because ground seven addresses the same issue as ground five, which has been found to be meritless, habeas relief is not warranted on ground seven.

## GROUND EIGHT

**Trotter's counsel filed a motion alleging that racial bias played a role in the State Attorney's decision to seek a death penalty in this case. The trial court's decision not to grant a full evidentiary on this issue was an unreasonable determination of the facts in light of the evidence presented before the state court in violation of Trotter's rights guaranteed under the Equal Protection Clause in the 14th Amendment of the U.S. Constitution.**

Trotter asserts that the resentencing court's refusal to grant a full evidentiary hearing, pursuant to his Amended Motion to Bar Death Penalty in Re-Sentencing of Melvin Trotter based on Arbitrary and Impermissible Racial Grounds, violated Trotter's rights guaranteed under the Equal Protection Clause in the 14th Amendment of the U.S. Constitution. (Dkt. No. 10 p. 32-34): (Dkt. No. 16 p. 20-22).

Trotter filed a motion on July 12, 1993, requesting a "full-fledged" evidentiary hearing on the role of racial bias in capital prosecutions conducted in Manatee County, during his resentencing. *Id.* In that report, Trotter's counsel provided statistics for all first degree murder charges filed in Manatee County for the sixteen years between 1977 and May, 1993, showing no instance where the death penalty had been applied in any homicide that involved a black victim. *Id.* Based on these statistics, Trotter questioned

the role of racial bias in capital prosecutions conducted in Manatee County, and requested an evidentiary hearing to further investigate. (Dkt. No. 16 p.20).

Trotter also claimed that the prosecutor's office gave substantial weight to the victim's family's decision to pursue the death penalty, after the family first agreed to pursue a life sentence penalty, claiming that race motivated the family to choose the death penalty. *Id.*

### Whether Race Played a Role in Prosecutions in Manatee County

Trotter raised this issue in his second direct appeal to the Florida Supreme Court, which found it meritless, without discussion. *Trotter*, 690 So2d at 1237. In his habeas petition, Trotter agrees that the state trial court properly applied the correct test, found in *Foster v. State*, 614 So.2d 455 (Fla. 1992), in which the Florida Supreme Court relied on the analysis set forth by the United States Supreme Court in *McClesky*. (Dkt. No. 16 p. 22). Trotter's contention is that the result found by the Florida Supreme Court was contrary to or an unreasonable application of that law. (Dkt. No. 16 p. 22).

In *McClesky*, the petitioner argued "that race [ ] infected the administration of Georgia's statute in two ways: persons who murder whites [were] more likely to be sentenced to death than persons who murder[ed] blacks, and black murderers [were] more likely to be sentenced to death than white murderers." *McClesky*, 481 U.S. at 291. Similarly, Trotter presented statistical evidence to the trial court, as well as evidence of racially objectionable statements made by the victim's family, in an attempt to obtain a full evidentiary hearing on whether race played a role in the prosecutor's decision to pursue the death penalty, which the trial court denied. (Ex. B20, p.58)

In *McClesky*, the United States Supreme Court found that the statistics presented were not appropriate for a capital sentencing decision:

> The Court has accepted statistics as proof of intent to discriminate in certain limited contexts. First, this Court has accepted statistical disparities as proof of an equal protection violation in the selection of the jury venire in a particular district... But the nature of the capital sentencing decision, and the relationship of the statistics to that decision, are fundamentally different from the corresponding elements in the venire-selection or Title VII cases... Thus, the application of an inference drawn from the general statistics to a specific decision in a trial and sentencing simply is not comparable to the application of an inference drawn from general statistics to a specific venire-selection or Title VII case.

*McClesky*, 481 U.S. at 293.

Further, in *McClesky*, to uphold such a charge, the United States Supreme Court said:

> Our analysis begins with the basic principle that a defendant who alleges an equal protection violation has the burden of proving "the existence of purposeful discrimination." A corollary to this principle is that a criminal defendant must prove that the purposeful discrimination "had a discriminatory effect" on him. Thus, to prevail under the Equal Protection Clause, McCleskey must prove that the decisionmakers in *his* case acted with discriminatory purpose.

*McClesky*, 481 U.S. at 292 (internal citations omitted).

The Florida Supreme Court found the issue meritless without explanation. The federal habeas court must look through that ruling to the previous most recent reasoned decision. *Tower v. Phillips*, 7 F.3d 206, 211 (11th Cir 1993). The next reasoned decision was that of the trial court. The state trial court ruled that the facts, as alleged in the motion, were insufficient to warrant an evidentiary hearing. (Ex. B18, p. 2148). The state trial court stated that even if, arguendo, the facts alleged were true, Trotter had not shown facts particular to his case, and thus his failed. (Ex. B18, p. 2148).

Trotter presented statistics regarding cases in Manatee County, but with a certain

lack of thoroughness as to the details surrounding each case. (Ex. B21. p. 49). Further,

the state. in the Answer brief of Appellee. noted that the statistics show that there were no

death row inmates from Manatee County, which was "hardly suggestive" of racial bias.

(Ex. B21, p.49). The United States Supreme Court is conservative with respect to

accepting statistical evidence to prove that a sentence "rests on purposeful

discrimination," and the Unites States Supreme Court did not accept far more detailed

statistics in a similar circumstance. *See McClesky*, 481 U.S. at 293. The evidence Trotter

presented did not amount to a study. but a compilation by defense counsel.

Whether Race Motivated the Decision to Pursue the Death Penalty

Trotter noted instances where the victim's family used the word "nigger." (Ex.

B20, p. 58). That, Trotter claims, showed race played a role in the decision to pursue the

death penalty. (Ex. B20, p. 58). One such instance, noted in the Initial Brief of

Appellant in the second direct appeal, reads as follows:

> Mr. Debensky (the attorney) stated that in discussions with Mr. Langford
> of the victim's family, he was told that the family would agree to a life
> sentence for Trotter. The next day, Mr. Langford phoned Dubensky and
> stated that after consultation with the other family members; their position
> was. "They wanted to see the nigger fry."

(Ex. B20, p.58).

The wording of this quote shows that a family member proposed an offer from the

family, the family consulted, and changed its mind. The use of the word "nigger" shows

animosity, but that does not directly equate to the family's motivation to pursue a death

sentence. Further. to transfer any such intent to the prosecutors would be improper. A

general policy to respect a family's wishes is laudable. To impute a victim's motivation

as the prosecutor's motivation would require a belief that a prosecutor could not have a proper motivation when a victim had an improper motivation. The prosecutors did not act with "purposeful discrimination" simply because the victim's family used racially derogatory words. The connection is too tenuous and not supported by the facts.

Further, it is likely that the victim's family knew Trotter's race when it initially considered life imprisonment. That knowledge undercuts the basis of Trotter's argument, in that Trotter's argument could only survive if the family had learned of Trotter's race in the time between the initial willingness to accept a life sentence, and when the family decided that only the death penalty would be acceptable to them. That fact pattern could give rise to a legitimate claim that the decision was racially motivated, but that is not the case here.

There was no error in the trial court's denial of Trotter's motion, nor the Florida Supreme Court's finding that the issue was meritless. Therefore, habeas relief is not warranted on ground eight.

## GROUND NINE

**Trial counsel's cause challenges as to three prospective jurors Bunting, Flanders, and Nieves who admitted that they would vote to impose a death sentence regardless of the mitigating evidence were denied. As a result of these denials, Trotter was deprived of a fair trial by an impartial jury in violation of his due process and U.S. Constitutional rights guaranteed under the 5th, 6th, and 14th Amendments.**

Trotter asserts that the resentencing court erred when it did not grant challenges for cause for jurors Bunting, Flanders, and Nieves. (Dkt. No. 10 p. 35-337); (Dkt. No. 16 p. 22-28), resulting in Trotter's counsel using three peremptory challenges on those jurors which, in turn, exhausted his supply of peremptory challenges before he reached jurors Johnston, McBride, and Thompson. (Dkt. No. 10 p. 35-337); (Dkt. No. 16 p. 22-28).

Consequently Trotter was unable to remove jurors Johnston, McBride[2], and Thompson[3], to whom Trotter objected. (Dkt. No. 10 p. 35-337); (Dkt. No. 16 p. 22-28). This, Trotter alleges, resulted in objectionable jurors Johnston, McBride, and Thompson serving on the venire, violating his 14th amendment right to due process, and his 6th and 14th Amendment right to an impartial jury. (Dkt. No. 10 p. 35-337); (Dkt. No. 16 p. 22-28).

As he did in ground one, Trotter brings this claim under the 14th Amendment right to due process, and the 6th and 14th Amendment right to a fair and impartial jury, as well as United States Supreme Court precedent set forth in *Ross v. Oklahoma*, which allows due process claims if a state violates its own rules regarding peremptory challenges, and fair and impartial jury claims if an objectionable juror is actually seated on a jury. *Ross*, 487 U.S. at 81.

Due to the wording of Trotter's petition and supporting memorandum, this single ground could be read to contain up to three grounds. (Dkt. No. 10 p. 35-37); (Dkt. No. 16 p.22-28). First, Trotter clearly alleges a 14th Amendment due process violation when he states that he was improperly forced to exhaust his peremptory challenges, thus preventing him from removing objectionable juror Johnston. Second, Trotter could be implying a violation of his 6th and 14th Amendment right to a fair and impartial trial because objectionable juror Johnston was seated, however the basis for Trotter's objection to juror Johnston is not plead, so it is not clear if it was a cause challenge, or

---

[2] See Ex. B8, p. 981-986 for the basis of the objection to juror McBride. Juror McBride's mother had a medical appointment the following day, and juror McBride had committed to a job for one day during the time when she would be on the jury.

[3] See Ex. B8, p. 1012 for the basis of the objection to juror Thompson: "Ms. Thompson indicated that because of her position with her children and – she just couldn't realize her children could be – she had two young children that got off at 3:00 in the afternoon and the didn't have a supervisor; she couldn't devote her attention for this case and it would affect her determination."

another challenge, based on the petition itself. Third, Trotter also indirectly alleges a violation of his 6th and 14th Amendment right to a fair and impartial jury because jurors McBride and Johnston should have been stricken for cause, but instead were seated on the jury. Again, the petition does not pursue this issue beyond that.

Trotter properly raised and preserved the 14th Amendment due process issue in state court. However, Trotter's petition makes no mention whatsoever as to why juror Johnston was objectionable. Trotter only alleges that juror Johnston was objectionable. (Dkt. No. 10 p. 35); (Dkt. No. 16 p. 23). The same is true for jurors McBride and Thompson, except that Trotter states that McBride and Thompson were challenged for cause. *Id.* at 23. The Initial Brief of Appellant on the second direct appeal, as well as the Reply Brief of Appellant, do not mention why juror Johnston was objectionable. Nor do they explain why jurors McBride and Thompson were objectionable

Trotter has properly preserved the due process claim for appeal, but not the impartial juror claims. If Trotter intended to pursue any issue other than the due process issue, he has not properly pled the issue in the habeas petition. *U.S. v. Carey*, 571 F.2d 1343, 1344 (5th Cir. 1978) ("When a petitioner simply [states his claim], and offers no allegations to support that conclusion ... the claim is insufficient to necessitate federal habeas consideration.") (citing *Weaver v. Texas*, 441 F.2d 388 (5th Cir. 1971)); *Bryant v. Elliot*, 472 F.2d 572, 573 (5th Cir. 1973); *Grant v. State of GA*, 358 F.2d 742 (5th Cir. 1966) ("The application fails to allege any facts upon which the trial court could find a deprivation of a constitutional right, or any other basis for collateral attack. Mere conclusionary allegations will not suffice.") (internal citation omitted). However, it appears that Trotter's main concern is the due process violation, and the discussion of the

three objectionable jurors is simply there to support his claim that he properly preserved the issue by identifying objectionable jurors.

A cold record does not afford the opportunity to perceive the many non-verbal communications that occur during voir dire. At the direction of the United States Supreme Court, trial judges are granted great deference in determining whether a prospective juror can follow the law and the instructions furnished by the trial judge. *Wainwright v. Witt*, 469 U.S. 412 (1985). In *Wainwright*, the United States Supreme Court stated:

> Once it is recognized that excluding prospective capital sentencing jurors because of their opposition to capital punishment is no different from excluding jurors for innumerable other reasons which result in bias, *Patton* must control. The trial judge is of course applying some kind of legal standard to what he sees and hears, but his predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record. These are the "factual issues" that are subject to § 2254(d).

*Id.* at 429.

As to factual issues, pursuant to the what is now 28 U.S.C. § 2254(e)(1): "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." Under this analysis, the factual determination of juror Bunting's credibility made by the judge is presumed correct. To overcome this high presumption, Trotter must show by clear and convincing evidence that the sentencing judge was actually incorrect. *Id.*

When asked how much he favored the death penalty, prospective juror Bunting stated that he was at the top of the range of those who favor it. (Dkt. No. 16 p. 23); (Ex. B7, p. 515). Other than self defense, he said that he believed in "an eye for an eye." (Ex.

Page 44

B7, p. 515). Trotter claims that this, and the fact that Bunting never demonstrated a willingness to weigh any other mitigating circumstances, demonstrated that Bunting was unfit to serve on Trotter's jury. (Ex. B7, p. 515). However, Bunting said that despite his views, he could follow the law and the instructions furnished by the trial judge. (Ex. B7, p. 572).

The record indicates that prospective juror Bunting clearly favored the death penalty. However, personal beliefs are not the issue. The issue is whether a juror can follow the law and instructions furnished by the judge. *Wainwright*, 469 U.S. at 429. Bunting said that he could do so, and the trial judge found his response to be credible. Trotter has not presented clear and convincing evidence to show that the sentencing judge erred.

Prospective juror Flanders was also a strong supporter of the death penalty. (Dkt. No. 16 p. 24); (Ex. B7, p. 615). Trotter's objection to prospective juror Flanders is similar to his objection to prospective juror Bunting. (Dkt. No. 16 p. 24). Trotter claims that the strength of Flanders' belief in the death penalty showed that he could not be an unbiased juror. *Id* at 26. However, Flanders stated that he recognized that not all murder cases warrant the imposition of the death penalty, and that he could listen to the judge's instructions and weigh the various circumstances. (Ex. B7, p. 615). For the same reasons stated above for prospective juror Bunting, Trotter has not presented clear and convincing evidence that the sentencing judge erred.

Prospective juror Nieves' responses during voir dire indicated that he was an advocate of the death penalty. (Dkt. No. 16 p. 26). (Ex. B8, p. 722). His responses also indicated at times a high likelihood that he would vote to impose the death penalty.

despite what evidence defense counsel presented.  (Ex. B8, p. 722).  However, Nieves

also clearly stated that he was aware that not all murderers deserved the death penalty,

and expressed an "unequivocal and unambiguous acceptance of that premise." (Ex. B9, p.

792-793).  Further, he indicated that his views would not prevent him from listening to

the evidence and following the law.  (Ex. B9, p. 792-793).  For the same reasons stated

above for prospective jurors Bunting and Flanders, Trotter has not shown by clear and

convincing evidence that the sentencing judge erred.

Trotter was not forced to use his peremptory challenges for seated jurors

Johnston, McBride, or Thompson in response to court error, and thus there was no 14th

Amendment due process violation.  No facts were presented in Trotter's petition to

support his claim that jurors Johnston, McBride, or Thompson were objectionable, and

the sentencing court should have struck them for cause, and thus any 6th and 14th

Amendment constitutional claim of a violation of his right to a fair and impartial jury, if

intended, was not properly pled.

## GROUND TEN

**Prospective Juror Panico doubted her ability to be fair and impartial due to
exposure to pretrial publicity and in viewing crime scene photographs of the victim.
Counsel raised a cause challenge and was denied.  As a result, objectionable jurors
remained on the jury and Trotter was denied a fair trial by an impartial jury as
required by due process and U.S. Constitutional rights guaranteed in the 5th, 6th,
and 14th Amendments.**

Trotter asserts that the resentencing court erred when it did not grant a challenge

for cause for juror Panico, which resulted in counsel using a peremptory challenge, which

caused Trotter's supply of peremptory challenges to be exhausted before he reached

jurors Johnston, McBride, and Thompson.  (Dkt. No 10 p. 37-40); (Dkt. No. 16 p. 29-32).

The lack of peremptory challenges prevented Trotter from being able to remove

objectionable juror Johnston as a peremptory strike. (Dkt. No 10 p. 37-40): (Dkt. No. 16 p. 29-32). This, Trotter alleges, resulted in objectionable juror Johnston serving on the venire. violating his 14th amendment right to due process, and his 6th and 14th Amendment right to an impartial jury. (Dkt. No 10 p. 37-40); (Dkt. No. 16 p. 29-32). This ground is nearly identical to ground nine, except that the basis for the cause challenge is different, and only a single juror, Panico, is named.

Ground ten is worded similar to ground nine, such that it could be read to assert a due process claim based on juror Panico, and an impartial jury claim based on the seating of juror Johnston. (Dkt. No. 10 p.37-39); (Dkt. No. 16 p.29-32). For the same reasons as in ground nine, the claim being asserted in ground ten is a 14th Amendment due process claim. and not a 6th and 14th Amendment impartial jury claim. Juror Panico was not seated, and no facts are alleged in the petition regarding a seated juror. which leaves only the due process claim.

Trotter claims that juror Panico was never able to allege unequivocally that she could be an impartial juror, and that she had four specific areas of concern. (Dkt. No. 16 p. 31). First. she had read articles about the crime and had formed an opinion about benevolence of the victim. (Dkt. No. 16 p. 31). Second. she felt that she would not be able to view graphic photographs that would be introduced as evidence in the case. (Dkt. No. 16 p. 31). Third. she felt that she would be unable to handle any murder weapon. Fourth, since she had been the victim of a burglary she was not sure that traumatic event would not adversely affect her thinking and deliberations and viewing evidence in the case. (Dkt. No. 16 p. 31). Trotter also notes that juror Panico stated she would not be starting the case with a "clean slate" due to the coverage. (Ex. B8, p. 708).

Juror Panico stated she would be able to remain fair and impartial. (Ex. B7, p. 601). Her media exposure to the crime had taken place a long while before, and she had not formed an opinion about the appropriate penalty then or at the time of the voir dire. (Ex. B8, p. 676. 678). Further, she wanted to be fair to Trotter (Ex. B8, p. 677, 707), and would weigh all the information before making any decision on sentencing. (Ex. B8, p. 707). Te prosecutor clarified the term "clean slate," as all the jurors already knew of Trotter's guilt, such that a true clean slate could not exist. (Ex. B8, p. 708). The record shows that Juror Panico was trying to convey that serving on the jury might be unsettling, that she would be able to listen to the evidence presented, and that she had not formed an opinion about whether life or death was the appropriate sentence. (Ex. B8, p. 706-709).

Juror Panico's responses did not show her clear, unequivocal ability to follow the law despite personal beliefs; however, they are also not clear and convincing examples of her inability to follow the law despite her personal beliefs. The responses fall in the area which is up to the discretion of the judge, who is charged with the determination of the panel member's credibility. *Wainwright*, 469 U.S. at 429. Absent clear and convincing evidence that the judge erred on the issue of panel member Panico's credibility, Trotter has not shown that habeas relief is appropriate, and no such evidence is in the record.

Assuming, arguendo, that juror Panico should have been excused for cause, the best Trotter could have hoped for would have been a shift in the sentencing jury's recommendation to ten to two in favor of a death recommendation, and that is all that is required. Trotter cannot show that he was actually prejudiced. Therefore, habeas relief is not warranted on ground ten.

## GROUND ELEVEN

**Trotter was denied an individualized sentencing hearing in accordance with _Lockett v. Ohio_ as evidenced by a deficient sentencing order in violation of the 8th and 14th Amendments to the U.S. Constitution.**

Trotter asserts that because he was sentenced to death, the United States Supreme Court precedent in _Lockett v. Ohio_, 438 U.S. 536 (1978) required that he receive an individualized sentencing hearing in accordance with 8th and 14th Amendments of the U.S. Constitution.  (Dkt. No. 10 p. 40-42); (Dkt. No. 16 p. 32-35).  Trotter contends that he did not get his constitutionally required individualized sentencing, and this was evident in the deficient sentencing order.  (Dkt. No. 10 p. 40-42); (Dkt. No. 16 p. 32-35).

Trotter contends that there are two problems with the sentencing order.  The first is that the order was written with one aggravating circumstance broken out as two.  (Dkt. No. 16 p.32).  Number three in the sentencing order read: "The crime for which the defendant is to be sentenced was committed while he was engaged in the commission of a robbery.  The Defendant went to Virgie Langford's store for the purpose of theft or robbery, and in fact committed a robbery, which resulted in the death of Virgie Langford." (Ex. B3, p. 544-545).  Number five in the sentencing order read: "The capital felony was committed for pecuniary gain." (Ex. B3, p. 544-545).  The prosecutor and judge at the time noted this and stated that they were considered as one, but did not make any notation on the order itself.  (Ex. B19, p. 2194).  Trotter contends that "accurate sentencing orders are required in order for meaningful review of death sentences and are required to be filed when oral pronouncement of sentence is made.  Such a requirement suggests that oral after the fact declarations by the court are insufficient to correct defects." (Dkt. No. 16 p.33).

As to the second deficiency, Trotter proposed thirteen non-statutory mitigating circumstances for the resentencing court's consideration. *Id.* at 34. The sentencing order noted Trotter's below average I.Q., family problems, and developmental problems, and disadvantaged background as non-statutory mitigation, and then stated: "The Court has considered the other non-statutory factors presented by the defendant." (Ex. B3, p. 546).

Trotter contends that such a brief statement regarding the remaining non statutory factors did not constitute discussion as required by Florida law that governed at the time. Thus, the sentencing order, without the required discussion, violated his right to an individualized sentencing and reliable death sentence. *Id.* Trotter notes that *Lockett v. Ohio* adopted as mitigating circumstances "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S.at 604. Further, Trotter cites *Eddings v. Oklahoma*, 455 U.S. 104 (1992) for the precedent that a judge cannot refuse to consider any mitigating evidence.

Trotter did not properly raise the issue in state court during the second direct appeal, contrary to what Trotter claims. Trotter did not mention a violation of federal law in the appellate brief, nor did he present any federal cases for consideration from which notice of a federal issue might be gleaned. *Id.*

"Exhaustion of state remedies requires that the state prisoner 'fairly presen[t] federal claims to the state court in order to give the State the *opportunity* to pass upon and correct alleged violations of its prisoners' federal rights.'" *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) (emphasis added). The Eleventh Circuit has allowed repeated references to United States Supreme Court precedent, as well as state court

precedent that relied on United States Supreme Court precedent, together with a reference to constitutional due process rights, to serve as notice of a federal issue. *Irwin v. McDonough*, 2007 WL 1745838, at *5 (11th Cir. 2007).

However, Trotter did not discuss the federal issue, and made no reference to United States Supreme Court precedent. Therefore, this claim is procedurally barred from review. Trotter has not shown "cause and prejudice," or that a "fundamental miscarriage of justice" will occur if the court does not reach the merits of the claim.

Further, the Florida Supreme Court dismissed as meritless Trotter's claims of deficiencies in the order. *Trotter*, 690 So.2d at 1237. With respect to the consideration of mitigating factors, in *Eddings*, the United States Supreme Court held that "the sentencer in capital cases must be *permitted* to consider any relevant mitigating factor." *Eddings*, 455 U.S. at 112 (emphasis added). The United States Supreme Court also said "[t]he sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." *Id.* at 115. The sentencing judge did state in his order that he considered the other mitigating evidence. (Ex. B3, p 546). Therefore, habeas relief is not warranted on ground eleven.

### GROUND TWELVE

**The Florida Death Penalty Statute is unconstitutional as applied under the 5th, 6th, 8th, and 14th Amendments to the U.S. Constitution. Appellate counsel was ineffective for failing to raise this error on appeal and the appellate court's ruling denying Trotter's claim resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law.**

Trotter raises two issues. First, he claims that the Florida Death Penalty Statute is unconstitutional as applied under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

(Dkt. No. 10 p. 42-45); (Dkt No. 16 p. 35-38).  Second, Trotter alleges that his appellate

counsel was ineffective for failing to raise related errors on appeal.  (Dkt. No. 10 p. 42-

45): (Dkt No. 16 p. 35-38).  Trotter also cites United States Supreme Court precedent in

*Apprendi v. New Jersey*, 120 S.Ct. 2348 (2000), and *Ring v. Arizona*, 536 U.S. 584

(2002).

Trotter contends that trial counsel filed a motion to declare Florida Statute

921.151 unconstitutional on four grounds: 1) lack of notice to the defendant; 2) there was

no requirement that the jurors find the aggravators beyond a reasonable doubt: 3) a lack

of specific sentencing findings by jury; and 4) failure to require that jury

recommendations of death be unanimous.  (Dkt. No. 10 p. 43).  The trial court denied the

motion.  (Dkt. No. 16 p. 35).  Trotter states that appellate counsel failed to raise the issue.

thereby performing deficiently, but he adds that he raised it in his state habeas petition,

which the Florida Supreme Court denied.  (Dkt. No. 16 p. 35).

In this petition Trotter claims that the Florida Death Penalty Statute is

unconstitutional for two reasons: 1) Aggravators are essentially circumstances of the

crime and the defendant's mental state for which the death penalty may be imposed, and

the defense must be noticed, but they were not included in Trotter's indictment. (Dkt. 16

p. 36); and 2) Since aggravators are really elements of the crime, they must be decided

unanimously by a jury, but the jury only voted to recommend the death penalty by eleven

to one. *Id*. at 37.

Trotter did not raise the ineffective assistance of appellate counsel claims in his

state habeas corpus petition.  Thus this claim is procedurally barred.  Trotter has not

shown "cause and prejudice" or that a "fundamental miscarriage of justice" will occur if this Court does not reach the merits of the claim.

Trotter did raise his claim regarding the unconstitutionality of the Florida Death Penalty Statute with respect to notice and the requirement of a unanimous jury in his state habeas petition. (Ex. D25 p. 5-29). However, Trotter did not raise the issue on direct appeal, as required by Florida law. *See Jones v. State*, 928 So.2d 1178, 1182 n.5 (Fla. 2006). Thus this claim is also procedurally barred. Trotter has not shown "cause and prejudice" or that a "fundamental miscarriage of justice" will occur if this Court does not reach the merits.

Additionally, *Ring* is not retroactive. *See Schriro v. Summerlin*, 542 U.S. 348, (2004); *Turner v. Crosby*, 339 F.3d 1247, 1282 (11th Cir. 2003); *Johnson v. State*, 904 So.2d 400, 412 (Fla. 2005). Thus, since Trotter's sentencing occurred prior to the ruling in *Ring*, Trotter cannot pursue a claim under *Ring*.

## GROUND THIRTEEN

**Execution by lethal injection or electrocution constitutes cruel and unusual punishment and would deprive Trotter of Due Process and Equal Protection of the Law in violation of the 4th, 5th, 6th, 8th, and 14th Amendments to the U.S. Constitution.**

Trotter claims that execution by lethal injection or electrocution constitutes cruel and unusual punishment, and he should be granted an evidentiary hearing or a full judicial review of Florida's lethal injection method of execution in light of evolving data suggesting that the execution method is cruel and unusual. (Dkt. No. 10 p. 45-47): (Dkt. No. 16 p. 38).

Trotter did not present this issue to the state court during his direct appeal. Trotter did raise the issue to the state trial court in his 3.850 motion to vacate. The state trial

court denied relief on the Rule 3.850 motion on March 20, 2003. (Ex. D8 p. 1375-1378). At the *Huff* evidentiary hearing on November 15, 2001, Trotter's counsel acknowledged that no evidentiary hearing was required on this claim. (Ex. D13 p. 36). No further request for an evidentiary hearing on the matter was pursued, and the trial court's adverse ruling on the Rule 3.850 motion to vacate was not raised in the Florida Supreme Court for appellate review.

Any claims regarding whether lethal injection or electrocution are cruel and unusual punishment must be procedurally barred because the issue should have been raised on direct appeal, but was not. *See Jones v. State*, 928 So.2d 1178, 1182 n.5 (Fla. 2006). Further, during the Rule 3.850 *Huff* hearing, Trotter abandoned his requests for an evidentiary hearing. Finally, he did not pursue the matter while appealing the state trial court's adverse *Huff* rulings to the Florida Supreme Court. Trotter has not shown "cause and prejudice" or that a "fundamental miscarriage of justice" will occur if this Court does not reach the merits of the claim. Therefore, habeas relief is not warranted on ground thirteen.

### GROUND FOURTEEN

**When viewed as a whole, the combination of procedural and substantive errors deprived Trotter of a fundamentally fair trial guaranteed to him under the 6th, 8th, and 14th Amendments to the U.S. Constitution. The trial court and appellate court's decision to deny this claim was contrary to or resulted in an unreasonable application of clearly established federal law or was an unreasonable determination of the facts.**

Trotter generally alleges that the claimed errors, when taken as a whole, amount to a fundamentally unfair trial, which virtually dictated the sentence of death. (Dkt. No. 10 p. 47-49); (Dkt. No. 16 p. 39).

This claim is procedurally barred for two reasons. First, this issue should have been raised on direct appeal, and since it was not. Trotter is barred from resurrecting it during post conviction proceedings. *See Cherry v. State*, 659 So.2d 1069 (Fla. 1995); *Medina v. State*, So.2d 293 (Fla. 1990). Second, although Trotter did raise the claim as issue VII in his 3.850 post conviction motion, Trotter abandoned the claim because he did not appeal the trial court's adverse ruling on this claim to the Florida Supreme Court. Trotter has not shown "cause and prejudice" or that a "fundamental miscarriage of justice" will occur of this Court does not reach the merits of the claim. Therefore, habeas relief is not warranted on ground fourteen.

## GROUND FIFTEEN

**Trotter was denied effective assistance of counsel due to counsel's failure to investigate and share information with the mental health expert so that an accurate assessment of trotter's background could be made. Counsel's failure is in violation of clearly established federal law and Trotter's rights under the 5th, 6th, 8th, and 14th Amendments to the U.S. Constitution.**

Trotter contends that his mental health expert, Dr. Krop, failed to interview Trotter's relatives, Gladys Casimir and Marsha Polite, because he was not provided with their contact information until the night before he was to appear in court. (Dkt. No. 10, p.50); (Dkt. No. 16 p. 39-43). This, Trotter contends, resulted in his jury not being able to consider all of the available mitigating evidence. (Dkt. No. 10, p.50); (Dkt. No. 16 p. 39-43).

Trotter did raise this claim, and was given an evidentiary hearing by the trial court, but post conviction relief was denied. The Florida Supreme Court addressed the claim and affirmed the denial of relief. *Trotter v. State*, 932 So.2d 1045 (Fla. 2006).

United States Supreme Court precedent in *Strickland v. Washington* requires that "[i]n order for a convicted defendant to succeed under a claim that counsel's assistance was "so defective as to require reversal of a conviction or death sentence." he must show two things. *Id.* He must first show that counsel's performance was deficient. *Strickland, 466 U.S. at 687.* Second, he must also show that the deficient performance prejudiced the defense. *Id.*

Both the trial court and the Florida Supreme Court found that the additional testimony that was gathered by the witnesses in question to be cumulative and irrelevant. *Trotter, 932 So.2d at 1051.* Counsel is not required to present cumulative and irrelevant evidence, and failure to do so does not fall below "prevailing norms." *Strickland*, 466 U.S. at 694. Thus, trial counsel's performance was not deficient, and Trotter fails the first prong of *Strickland.* Second, as there were four aggravating factors, and two statutory, and several non statutory mitigating factors, it is hard to see how cumulative and irrelevant evidence prejudiced him. This falls short of "a probability sufficient to undermine the confidence of the outcome." *Id.* Thus, Trotter fails the second *Strickland* prong. Therefore, habeas relief is not warranted on ground fifteen.

## GROUND SIXTEEN

**Trotter's 8th Amendment right against cruel and unusual punishment will be violated as he may be incompetent at the time of execution.**

Pursuant to Florida Rules of Criminal Procedure 3.811 and 3.812, a prisoner cannot be executed if "the person lacks the mental capacity to understand the facts of the impending death and the reason for it." Trotter acknowledges that the Florida rules require that a death warrant be issued before a claim of incompetence can be asserted. (Dkt. No. 10 p. 52-54); (Dkt. No. 16 p. 43-44). Trotter acknowledges the same holding

exists under federal law. (Dkt. No. 16 p. 44) (citing *Martinez-Villareal v. Stewart*, 523 U.S. 637 (1998); *Herrera v. Collins*, 506 U.S. 390 (1993)). Finally, Trotter notes that in *In Re Provenzano*, 215 F.3d 1233 (11th Cir. 2000), the Eleventh Circuit held that such a competency hearing is "subject to the strictures of 28 U.S.C. 2244(b)(2), barring successive petitions absent circumstances." (Dkt. No. 26 p. 44). Accordingly, Trotter only raises this claim to preserve it for future review. *Id.*

Trotter raised this issue in the Florida Supreme Court, which ruled that the claim must await the signing of a death warrant. *Trotter*, 932 So.2d at 1053-1054. This claim is not ripe for review. Therefore, habeas relief in not warranted under ground sixteen.

## CONCLUSION

The Court has carefully considered the petition and has addressed the claims as presented. Pursuant to *Clisby v. Jones*, 960 F.2d 925 (11th Cir. 1992), *cert. denied*, *Clisby v. Alabama*, 513 U.S. 1162 (1995), the Court is required to address all claims in a 28 U.S.C. section 2254 petition. If any claims were not addressed, the reason for the omission is that the claim was not apparent on the face of the filing. However, the Court's evaluation of the claims, as set out in this order, convinces the Court that any claims that not specifically addressed above have no merit. Accordingly, it is

**ORDERED** Defendant's Petition for a Writ of Habeas Corpus (Dkt. No. 10) is hereby **DENIED** and the Clerk of Court is directed to enter judgment against petitioner Trotter and to close the case.

.

## CERTIFICATE OF APPEALABILITY AND
## LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

**IT IS FURTHER ORDERED** that petitioner is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). Id. "A [COA] may issue only if the applicant has made a substantial showing of the denial of a constitutional right." Id. at § 2253(c)(2). To make such a showing, petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,' " *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Petitioner has not made the requisite showing in these circumstances.

Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal in forma pauperis.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this _6th_ day of November, 2007.

ELIZABETH A. KOVACHEVICH
United States District Judge

Cc: All Parties and Counsel of Record